# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| ROSE A. MCGILL, | : | Case No. 3:17-cv-00131 |
| | : | |
| Plaintiff, | : | District Judge Thomas M. Rose |
| | : | Magistrate Judge Sharon L. Ovington |
| vs. | : | |
| | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

## I.    Introduction

The Social Security Administration denied Plaintiff Rose McGill's October 11, 2103 application for Supplemental Security Income. She brings the present case challenging that denial. At issue is the decision by Administrative Law Judge (ALJ) Gregory G. Kenyon. He concluded that Plaintiff is not under a disability and, consequently, not eligible to receive Supplemental Security Income.

Plaintiff seeks an Order reversing ALJ Kenyon's decision and remanding for an award of benefits. The Commissioner seeks an Order affirming ALJ Kenyon's decision.

## II.    Background

### A.    Plaintiff's Vocational Profile and Testimony

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

Plaintiff was 47 years old on her asserted disability onset date. She was therefore considered a younger person under Social Security Regulations. 20 C.F.R. § 416.963(c). She has an eleventh-grade education and no past relevant work. She does not read or write very well. She can read a newspaper but does not understand what she reads. (Doc. #6, *PageID* #75).

During an administrative hearing held by ALJ Kenyon, Plaintiff testified that she is 5 feet 6 inches tall and weighs 261 pounds. She lives alone in an apartment. She has a driver's license but does "not really" drive—she just doesn't want to. *Id*. at 75.

She began having back problems after her first child was born. Her back pain had worsened in the last couple of years before the ALJ's hearing (in September 2015). *Id*. It is a sharp pain in her lower back that radiates into her hip. She estimated her pain severity at 4 on a 0-10 scale (10 equaling the most pain). Low-back pain causes her trouble bending at the waist. *Id.* at 78.

Plaintiff was using a wheelchair at the time of the ALJ's hearing due to recent surgery. She had previously used a walker starting in approximately 2012 due to weakness in her legs due to blood loss from bleeding, which had been surgically corrected. *Id.* at 79.

Plaintiff also testified to suffering from breathing problems, noting "it's hard for me to walk anywhere… I can't breathe, I get really weak, lightheaded, I want to fall down." *Id.* at 82. This occurs whenever she walks. She does not use inhalers and does

not smoke.  She is limited to walking 40 to 50 feet because she gets out of breath.  *Id*. at

86.  She can sit for 60 to 90 minutes.

Plaintiff has a history of anxiety and depression.  She said she isolates herself in

her room 15 hours per day and rarely leaves her home because she gets nervous and

anxious around others.  *Id.* at 83-84.  When she watches television, she has a hard time

paying attention.  She explained, "My mind drifts off on everything I do…."  *Id.* at 85.

Plaintiff estimated that that she is cannot lift more than 5 pounds or walk more

than 50 feet.  *Id.* at 87.  She can stand in one spot for 3 or 4 minutes.

As to daily activities, Plaintiff testified that she spends most of her time in her

room laying down and playing solitaire on her phone.  *Id.* at 86.  She can dress herself,

take a shower and bath but has a hard time doing her hair.  *Id.* at 87.  She doesn't perform

household chores; her daughter visits and helps.  She likes to sit at her desk and read her

Bible for 30-minutes.  *Id.*  She stops because she gets tired and gets frustrated with her

inability to understand it.  She also forgets what she's read.  *Id*. at 91.  There was a time

when she went to Bible study on Friday nights but this lasted only 2 months because she

"just wanted to go back into [her] corner…."  *Id*. at 92.

## B.  **Mental Impairments**

### TCN Behavioral Health

Plaintiff sought mental health treatment at TCN in October 2012.  (Doc. #6,

*PageID* #s 293-312).  She presented feeling depressed and having difficulty leaving her

home because of limited motivation and an inability to safely walk. *Id.* at 293, 311.

Plaintiff was diagnosed with recurrent depressive psychosis. *Id*. at 403.

When seen by her therapist in December 2012, Plaintiff reported that she has gotten a walker, an eye exam, new glasses and her driver's license. Her medications were working very well. She indicated that her mood was very good and she had been able to come out of her room and help with fixing meals. She was also able to visit with visitors and not feel overwhelmed. *Id.*at 341. On mental-status examination, Plaintiff was well groomed, exhibited slow speech, was cooperative, thought process was within normal limits, her mood was euthymic, full range effect, but she appeared confused with limited insight and judgment. *Id.* at 339-40.

Plaintiff saw Bobbie Fussichen, APRN, BC, a nurse specialist, for a psychiatric evaluation on December 2, 2012. *Id.* at 386-90. Plaintiff reported a history of depression for at least 1 year, low energy, interest, and motivation. She isolated herself in her room, slept poorly, and had decreased concentration. *Id.* at 386. During a mental-status examination, Plaintiff exhibited slow speech, depressed mood, restricted affect, impaired cognition, and poor insight/judgment. *Id.* at 388-89. She had no previous mental health treatment. *Id.* at 390.

In February 2013, Plaintiff's daughter called TCN and reported that Plaintiff will not get out of bed to take her medication. She received medical news about having tumors and denied social-security benefits. *Id.* at 361.

In April 2013, Plaintiff reported to Nurse Fussichen that she was moving a little better, had been going to physical therapy, sleeping ok, sleeping during the day but was awake at night. Her appetite was good and she had no new problems. Her medications were helping and she felt less depressed. *Id.* at 394. On mental-status examination, her thought content was normal, she was cooperative, her mood was improved but she remained depressed, and she had a full affect. *Id.* at 394-95.

On August 14, 2013, Plaintiff met with a CSS (Community Support Services) staff member, a support program provided by TCN Behavioral. Plaintiff reported that on a bad day, she has depression with symptoms including self-isolation, loneliness, and tearfulness. *Id.* 314. On August 27, 2013, Plaintiff met again with a CSS staff member who noted Plaintiff's "mood was good with cooperative behavior and disorganized thought process…." *Id*. at 318. She was sleeping well and taking medications as prescribed. *Id.* at 317-18.

During a home visit in September 2013, the same CSS staff member informed Plaintiff that he would assist her in applying for SSI. He also informed her "that due to her diagnosis and ability to work that she may not qualify for SSI." *Id.* at 320. When seen by Nurse Fussichen on October 2, 2013, Plaintiff's mood was a little depressed, she was cooperative and had normal thought processes. She reported to Nurse Fussichen that she was getting 7 hours of broken sleep and her medication was helpful expect for sleep. *Id.* at 400.

The CSS staff member visited Plaintiff's home in November 2013 to help her with a phone interview she had with the Social Security Administration. *Id*. at 331. He noted that Plaintiff had to be redirected multiple times throughout the meeting due to depression and anxiety, which caused her to become anxious and lose focus on the task at hand. *Id.* In December 2013, the CSS staff member visited Plaintiff to assist her with symptom self-monitoring due to disorganization, depression, and anxiety. He reviewed Plaintiff's daily activities with her due to isolation, reviewed the importance of increasing daily activity, and encouraged her to be more active. He noted Plaintiff's mood was good, her behavior was cooperative, and her thought process was disorganized. *Id.* at 449.

Nurse Fussichen completed a mental impairment questionnaire in late January 2014. *Id.* at 418-21. She diagnosed Plaintiff with major depression, recurrent. *Id.* at 418. Plaintiff's symptoms include sleep and mood disturbances; psychomotor agitation or retardation; social withdrawal or isolation; blunt, flat, or inappropriate affect; and decreased energy. *Id*. Nurse Fussichen found that Plaintiff's symptoms had improved with medication, but she continued to struggle and her prognosis was guarded. *Id.* at 419.

Nurse Fussichen opined that Plaintiff was markedly restricted in her ability to maintain concentration, persistence, or pace; maintain attention for extended periods; make simple work-related decisions; comprehend detailed instructions; ask simple questions or requests assistance; and, respond appropriately to criticism from supervisors.

*Id.* at 420.  According the Nurse Fussichen, Plaintiff would be moderately limited in her activities of daily living and in her ability to maintain social functioning; understand and remember instructions; maintain a schedule; sustain an ordinary routine; complete a normal work day and work week; interact with the general public; and get along with coworkers and peers.  *Id.*  She further opined that Plaintiff's mental impairments would cause her to be absent from work greater than 3 times each month.  *Id.*

During a telephone conversation with the CSS staff member in February 2014, Plaintiff's mood was good, she was cooperative and had disorganized thought process. She reported sleeping well.  *Id.* at 733-34.

In July 2014, Plaintiff's daughter reported that Plaintiff was "more emotional," she felt more irritable and does not like to be around people."  *Id.* at 806.  Plaintiff exhibited a depressed and irritable mood with restricted affect and impaired cognition.  *Id.* at 806-07. She also reported in early July 2014 that she becomes stressed and then depressed with issues relating to family and her anxiety of being around new people.  *Id.* at 752.

On November 7, 2014, Nurse Fussichen completed a second mental-impairment questionnaire noting that Plaintiff's symptoms remained the same.  *Id.* at 827.  Her symptoms were improving with medication.  Her prognosis was guarded.  *Id.* at 828. Nurse Fussichen found when Plaintiff's medical concerns increase, her mental-health symptoms increase.  *Id.*  As to functional limitations, Nurse Fussichen found Plaintiff was either slightly or moderately limited in all mental work-related functions.  *Id.* at 829-30.

Nurse Fussichen again opined that Plaintiff's impairments would cause her to be absent from work more than 3 times per month. *Id.* at 829. She concluded that Plaintiff would be off-task for 20% or more of a typical workday. *Id.* at 830.

A CSS staff member reported in December 2014 through February 2015, that Plaintiff was doing well, calm, cooperative, and/or less symptomatic. *Id.* at 1077, 1079, 1081, 1083, 1083. On December 8, 2014, she reported traveling to Tennessee to visit her brother a couple months' prior, having a "really good time and was going to visit again soon." *Id.* 1079. In January 2015, Plaintiff reported that she sometimes just stays in her room because it feels safe but she now she should get out and wants to but is having trouble doing so." *Id*. at 1082. In early February 2015, Plaintiff she was not experiencing any recent symptoms of depression or anxiety and her new medication seemed to be working well. *Id.* at 1083. On February 12, 2015, she reported enjoying going to church and did not experience anxiety there, so she wanted to go more often. She also stated that during warmer weather, she liked talking walks through parks because she enjoyed nature. *Id.* at 1085.

Twice in April 2015, a CSS staff member went to Plaintiff's home in an attempt to meet with Plaintiff but noted she either was not home or did not answer the door. *Id.* at 1104-05. On May 12, 2015, Plaintiff reported that she had been "staying pretty busy," helping her mother take care of her father, and that it was good for her to keep busy. *Id*. at 1087. Her medication dosage was increased at her appointment with Nurse Fussichen

the day before.  The CSS staff member observed that Plaintiff was stable, but "a little depressed."  *Id.*

The remaining treatment's notes from 2015 show Plaintiff was observed to be cooperative, doing "pretty well," and that she had not experienced too many symptoms of depression or anxiety.  *Id.* at 1089-97.

### George O. Schulz, Ph.D.

Psychologist Dr. Schulz examined Plaintiff in January 2013 at the request of the state agency.  *Id.* at 281-89.  When Dr. Schulz asked Plaintiff about the nature of her disability, she responded, "I just don't want to go anywhere; I just want to stay in my room. I am always afraid I am going to fall and I don't want to be embarrassed."  *Id.* at 282.  Dr. Schulz observed that Plaintiff's affect was appropriate and congruent, and her mood was euthymic.  *Id.* at 286.  She told Dr. Schulz that she had trouble falling to sleep and she would wake up during the middle of the night.  When asked about her symptoms of depression, she explained, "I just don't want to do anything, I feel like there is no hope for me.  I feel lonely."  *Id.*

Dr. Schulz diagnosed Plaintiff with depressive disorder.  *Id.* at 287.  He opined that she "is expected to be able to understand and apply instructions in a work setting within the borderline range of functioning."  *Id.* at 288.  He reported, "given her performance today on formal mental status examination tasks[,] she is likely to experience some objective performance concerns by employers[.]"  *Id.* at 289.  He

believed that Plaintiff could respond appropriately to coworkers and supervisors in a work setting but is "likely to have some difficulty responding appropriate to work pressure." *Id.*

### State Agency Psychologists

Karla Voyten, Ph.D., reviewed Plaintiff's file on behalf of the agency in November 2013. *Id.* at 107-15. She found that Plaintiff was moderately restricted in her activities of daily living. She had moderate difficulties in her social functioning and in concentration, persistence, or pace. *Id.* at 110. Dr. Voyten thought Plaintiff was partially credible about her symptoms of depression but noted she can still complete activities of daily living without help and handles finances and shops. *Id.* at 111. Dr. Voyten concluded Plaintiff was not significantly limited in her ability to ask simple questions or request assistance and in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. She was moderately limited in her ability to interact with the general public, to accept instructions and respond appropriately to criticism from supervisors, according to Dr. Voyten. *Id.* at 114-15.

Another state-agency psychologist, Tonnie Hoyle, Psy.D., reviewed Plaintiff's file and affirmed Dr. Voyten's assessment in March 2014. *Id.* at 118-32.

### C. Physical Impairments

### Meghan Brewster, M.D.

Plaintiff began receiving primary care from Dr. Brewster in April 2013 at which

time she was observed using a walker.  *Id.* at 538.  Over the course of treatment, Dr. Brewster's records show Plaintiff was treated for worsening low back pain, hypothyroidism, urinary incontinence, anemia, shortness of breath, generalized weakness, dyslipidemia, major depression and abdominal pain, and knee pain.  *Id.* at 413-16, 527-49, 607-08, 1037-42.  Dr. Brewster's records show that Plaintiff exhibited palpable tenderness about her abdomen, an abnormal gait, reduced spinal range of motion, weakness in her extremities, and she was ambulating with a walker.  *Id.* at 414, 531, 534, 536, 539, 1038.

On November 25, 2013, Dr. Brewster reported Plaintiff's diagnoses as urinary incontinence, hypothyroidism, status/post hysterectomy, obesity, dyslipidemia, major depression, osteoarthritis, and anemia.  *Id.* at 410.  Dr. Brewster noted that she suffers from "[s]ignificant deconditioning and anemia from bleeding fibroids SP [status post] hysterectomy 5/16/13.  Improving and but still weakness."  *Id.*  Dr. Brewster concluded, "due to decreased functionality and weakness, [she] would have difficulty with work activities."  *Id.* at 411.

### Martin Ambrose, M.D.

In March 2014, Plaintiff consulted with pulmonary specialist, Dr. Ambrose for exertional dyspnea.  *Id.* at 816.  A pulmonary function test showed, "1. Mild restrictive ventilatory defect.  2. Normal spirometry…. 3. Moderately reduced diffusion can represent underlying pulmonary parenchymal or pulmonary vascular disease.  4.

Flattening of the inspiratory limb of the flow volume loop can represent variable extrathoracic obstruction." *Id.* 555. She underwent a chest CT in May 2014, which demonstrated evidence of mild air trapping and a small pericardial effusion. *Id.* at 826. When seen for follow-up in June 2014, Dr. Ambrose listed her active health problems as including arthritis, obesity, hypothyroidism, mixed dyslipidemia, urinary incontinence, major depression, anemia (unspecified), purulent mastitis (in female), difficult ventilator weaning, post-operative status (hysterectomy), dyspnea. *Id.* at 1048. Dr. Ambrose diagnosed Plaintiff with obstructive sleep apnea (on CPAP), obesity class III (morbid obesity), and major depressive disorder without psychotic features. *Id.* at 1051

### Damian Danopulos, M.D.

Dr. Danopulos examined Plaintiff on December 11, 2012 for the Ohio Bureau of Disability Determinations. *Id.* at 268-78. Plaintiff's height was 65½ inches; she weighed 248 pounds. Id at 271. She told Dr. Danopulos that the following problems prevent her from working: 1) effort related shortness of breath, 2) bilateral knee pain, 3) urinary incontinence, 4) bilateral hip pain, 5) bilateral ankle pain and 6) depression. *Id.* at 268. On examination, Dr. Danopulos found restricted and painful motions in Plaintiff's hips and knees as well as normal but painful range of motion in her ankles. *Id.* at 270. He observed that Plaintiff's gait was normal with the help of a walker. She could not get onto his examination table. *Id.* X-rays of her left hip and left knee were interpreted as unremarkable or negative. *Id.* at 271, 277-78. Dr. Danopulos concluded, "[Plaintiff's]

ability to do any work related activities is affected and restricted from her morbid obesity, which does not allow her to move around properly and she uses a walker to help stabilize her gait when she moves around…. [She has] multiple arthralgias, like bilateral knee, hip and ankles plus urinary stress incontinence." *Id.* at 272.

Plaintiff was again examined by Dr. Danopulos for disability purposes on May 9, 2014. *Id.* at 562-76. She reported sleep apnea, shortness of breath, and low-back pain. *Id.* at 562. She weighed 264 pounds (this was after her hysterectomy). Dr. Danopulos found full range of motion in Plaintiff's upper and lower extremities. "Musculoskeletal evaluation revealed a normal gait without ambulatory aids. Spine was painful to pressure in the lower lumbar spine. She could get on and off of the examination table without difficulty. Bilateral straight leg rising was normal. Squatting and arising from squatting were normal. Lumbar spine motions were restricted and painful. Toe and heel gait was denied. There was no evidence of nerve root compression or peripheral neuropathy." *Id.* at 565. Lumbar spine x-rays which revealed moderately advanced discovertebral degeneration at L1-L2 and L2-L3, mild disc degeneration at L4-L5, multilevel facet arthritis and straightening of the lumbar spine. *Id.* at 565, 571. *Id.* at 572-76. A ventilatory function study showed mild restrictive lung disease. *Id.* at 565. Dr. Danopulos concluded that Plaintiff could perform a semi-sedentary, sedentary or mild job. *Id.* at 566.

**State Agency Reviewers**

Linda Hall, M.D. reviewed Plaintiff's medical record in November 2013 and determined that she could lift/carry twenty pounds occasionally and ten pounds frequently; stand/walk about two hours in an eight-hour workday; and sit about six hours in an eight-hour workday. She was limited to pushing and/or pulling with both lower extremities. *Id.* at 112. Dr. Hall opined that Plaintiff's "[a]bility to do any work-related activities is affected and restricted from morbid obesity, which does not allow her to move around properly and she uses a walker to stabilize her gait when she moves around." *Id.* Dr. Hall noted that Plaintiff has multiple arthralgias and urinary stress incontinences. *Id.* Dr. Hall opined that Plaintiff could never climb ladders, ropes, and scaffolds; never kneel or crawl; occasionally balance, stoop, or crouch. *Id.* at 112-13.

Abraham Mikalov, M.D. reviewed Plaintiff's medical record in May 2014 and affirmed Dr. Hall's findings except he increased Plaintiff's walking tolerance to six hours. *Id.* at 128-30.

## III.  <u>**"Disability" Defined and The ALJ's Decision**</u>

Plaintiff's eligibility to receive Supplemental Security Income hinged on whether he was under a "disability" as defined by social security law. *See* 42 U.S.C. § 1381a,; *see also Bowen v. City of New York*, 476 U.S. 467, 470 (1986). Narrowed to its statutory definition, a person is "considered to be disabled … if he [or she] is unable to engage in any substantial gainful activity by reason of any medically determinable physical or

14

mental impairment which … can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

As noted previously, it fell to ALJ Kenyon to evaluate the evidence connected to Plaintiff's application for benefits. He did so by considering each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 416.920. His significant findings for present purposes began with his conclusion that Plaintiff had severe impairments—degenerative disc disease of the lumbosacral spine; obesity; chronic obstructive pulmonary disease; obstructive sleep apnea; and depression—but his impairments did not constitute a disability under the Listings, 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ next found that the most Plaintiff could do despite her impairments (her residual functional capacity, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002)) was light work subject to the 11 limitations:

> (1) occasional crouching, crawling, kneeling, stooping, balancing, and climbing of ramps and stairs; (2) no climbing of ladders, ropes, and scaffolds; (3) no work around hazards such as unprotected heights or dangerous machinery; (4) no concentrated exposure to temperature extremes or respiratory irritants; (5) no operation of automotive equipment; (6) occasional operation of foot controls; (7) limited to performing unskilled, simple, repetitive tasks; (8) occasional contact with coworkers and supervisors; (9) no public contact; (10) no fast paced production work or jobs involving strict production quotas; and (11) limited to performing jobs in a relatively static work environment in which there is very little, if any, change in the job duties or the work routine from one day to the next.

*Id.* at 53.  With this residual functional capacity in mind, along with Plaintiff's age, education, and work experience, the ALJ concluded that Plaintiff could perform a significant number of jobs available in the national economy.  *Id.* at 58-59.  He therefore concluded that Plaintiff was not under a disability and hence not eligible for Supplemental Security Income.  *Id.* at 59-60.

## IV.  <u>Standard of Review</u>

The Social Security Administration's denial of Plaintiff's application for benefits—embodied in ALJ Kenyon's decision—is subject to judicial review along two lines: whether he applied the correct legal standards and whether substantial evidence supports his findings.  *Blakley v. Comm'r of Social Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *see Bowen v. Comm'r of Social Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).  Reviewing the ALJ's legal criteria for correctness may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Social Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746.  Substantial-evidence review does not ask whether the Court agrees or disagrees with the ALJ's factual findings or whether the administrative record contains evidence contrary to those factual findings.  *Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, substantial evidence supports the ALJ's factual findings when a "'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'"  *Blakley*, 581 F.3d at

406 (quoting *Warner v. Comm'r of Social Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).

Substantial evidence consists of "more than a scintilla of evidence but less than a

preponderance..." *Rogers*, 486 F.3d at 241.

## V. Discussion

### A. Medical Source Opinions

Plaintiff argues that the ALJ erred by not properly weighing the medical source

opinions provided by treating sources Dr. Brewster and Nurse Fussichen, and the

opinions provided by the state-agency reviewing physicians/psychologists.

Social Security Regulations require ALJs to adhere to certain standards when

weighing medical opinions. "Key among these is that greater deference is generally

given to the opinions of treating physicians than to those of non-treating physicians,

commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations

omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight"
> if two conditions are met: (1) the opinion "is well-supported
> by medically acceptable clinical and laboratory diagnostic
> techniques"; and (2) the opinion "is not inconsistent with the
> other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20

C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how

much weight is appropriate, must consider a host of factors, including the length,

frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d 541, 544 (6th Cir. 2004)); *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting, in part, 20 C.F.R. § 404.1527(d)(2)).

Beginning with Dr. Brewster, Plaintiff argues that ALJ Kenyon failed to even recognize that Dr. Brewster answered the November 2013 interrogatories. Rather than identify Dr. Brewster, the ALJ attributed the interrogatory answers to "the individual who signed" the same. (Doc. #6, *PageID#* 57). According to Plaintiff, "This represents a patent failure to apply the two-step method required when weighing a treating source's opinions.

The ALJ's failure to recognize Dr. Brewster as the individual who answered the November 2013 interrogatories constituted error. During the ALJ's hearing, Plaintiff's counsel notified the ALJ that Dr. Brewster "completed a form for Bureau of Disability Determination in November of 2013. That's Exhibit 5F, page 5." (Doc. 6, *PageID* #73 citing *PageID* #411). This information is consistent with the fact that Dr. Brewster was treating Plaintiff from April 2013 through November 2014, a time period during which the interrogatories were answered. And, Dr. Brewster's treatment records from October 2013 are attached to the interrogatory answers further confirming that the interrogatory answers were her treating-medical-source opinions. *Id*. at 400-416.

The Commissioner counters that even if the ALJ should have found that Dr. Brewster answered the interrogatories, he properly placed no weight on her opinions because she made no attempt to explain with any specificity why Plaintiff is unable to work. The Commissioner points out that Dr. Brewster provided no specific opinion about Plaintiff's ability to sit, stand, walk, bend, stoop, lift, grasp, etc.

The Commissioner and the ALJ overlook that Dr. Brewster identified Plaintiff's diagnoses, recounted the nature of her symptoms—including, "significant deconditioning & anemia from bleeding fibroids s/p [status post] hysterectomy 5/16/13. Improving but still weakness." *Id*. at 410. Dr. Brewster also listed Plaintiff's medications and noted she was "compliant." *Id*. at 411. Most significantly, by not recognizing that Dr. Brewster's answers were from a treating medical source, the ALJ overlooked the two-step weighing procedure mandated by Social Security Regulation, Ruling, and case law. *See Cole*, 661 F.3d at 937 (citing the applicable Regulation, Ruling, and *Wilson*, 378 F.3d at 544-45).

  Proceeding in this manner, the ALJ missed the rationale provided by the Regulations for generally placing more weight on treating-medical-source opinions: They are "'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone'...." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. §416.927(d)(2)). Even if the supportability factor supported giving less weight to Dr. Brewster's opinion, this factor is not

considered until after the ALJ determines whether her opinion is due controlling weight under the treating physician rule. *See Rogers*, 486 F.3d at 242 ("in all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference, its non-controlling status notwithstanding."). And, the ALJ merely glanced at Dr. Brewster's opinion by considering only one of the factors under which her opinion needed to be reviewed. This constitutes further error because it avoided the regulatory mandate to provide "good reasons" for rejecting Dr. Brewster's opinions. *See id*. Lastly, the ALJ's missteps were not harmless due to Dr. Brewster's long-term-treatment relationship with Plaintiff and because Dr. Brewster's opinion is logically connected to the medical treatment she provided Plaintiff. *See Wilson*, 378 F.3d at 546 ("The ALJ's error is 'not made harmless simply because [the aggrieved party] appears to have had little chance of success on the merits anyway.'" (brackets in *Wilson*)).

Turning to Nurse Fussichen's opinions, the ALJ placed "some, but not much weight" on her opinions. (Doc. #6, *PageID* #56). The ALJ was correct to find that under the Regulations, Nurse Fussichen falls outside the category of "acceptable medical source." 20 C.F.R. § 416.913; *see* Soc. Sec. R. 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2005). But, Nurse Fussichen an "other source," 20 C.F.R. § 416.913(d)(1), "who is entitled to consideration due to her expertise and long-term relationship with [Plaintiff]." *Cole*, 661 F.3d at 939. The ALJ may have realized the significance of Nurse Fussichen's

opinions because he provided other reasons for placing "not much weight" on her opinions. Yet, his reasons stretched the evidence to unreasonable and generalized conclusions. For example, he generally referred to "other treating sources at TCN" without identifying the other treating source or mentioning how such evidence conflicted with Nurse Fussichen's opinions.

Although the Commissioner delves into the record for evidence that supports the ALJ's reasoning, such post-hoc rationalizations are insufficient in this case given the long-term and specialized mental-health care Nurse Fussichen provided Plaintiff. *See Evans v. Comm'r of Soc. Sec.*, 142 F.Supp.3d 566, 575 (S.D. Ohio 2015) ("[I]t is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration.") (Rose, D.J.; Newman, M.J.).

Additionally, the ALJ rejected Plaintiff's testimony that she severely isolates herself from others by remaining home and in her room during most days. To support this rejection, the ALJ mistakenly found that Plaintiff "does get out quite a bit, does well when she does so, and has not been home when others have come to check on her." (Doc. #6, *PageID* #56). Yet, the record supports Plaintiff's testimony that she isolates herself at and within her home and does not like being around others. *See id*. at 293, 314, 344, 361, 426, 752, 806, 1117. The ALJ also failed to acknowledge that the treatment notes about home visits that indicate either she was not at home or was not answering her door. *See id*. Adopting the former possibility without considering the latter tends to show

that the ALJ was looking for evidence to support his predestined non-disability conclusion rather than conducting a balanced review of the evidence. *See Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) ("[A] substantiality of evidence evaluation does not permit a selective reading of the record."); *see also Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) ("ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."); *Minor v. Comm'r of Soc. Sec*., 513 F. App'x 417, 435 (6th Cir. 2013) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis).

Lastly, Plaintiff argues that the ALJ erred by not adequately weighing the state agency medical sources' opinions. This argument is well taken. ALJs must consider the regulatory factors when weighing the opinions provided by consulting, non-treating, and record-reviewing medical sources. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 836-37 (6th Cir. 2016). The ALJ provided no indication of why he placed great weight on the opinions of Drs. Hoyle, Voyten, and Mikalov. He consequently did not weigh them under any of the factors required by the Regulations. He instead seemed to credit their opinions to the extent they agree with his assessment of Plaintiff's residual functional capacity. This reversed things. Medical source opinions, once weighed under the correct legal criteria, inform the assessment of a claimant's residual functional capacity. Residual functional capacity assessments do not control how much weight is placed on a medical source's opinion. *See* 20 C.F.R. § 416.945(a)(3).

Accordingly, Plaintiff's Statement of Errors is well taken.[2]

**B.     Remand**

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right.  *Bowen*, 478 F.3d at 746.  Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits.  *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994).  The latter is warranted where the evidence of disability is overwhelming or

---

[2] Because of this conclusion and the resulting need to remand this case, an in-depth analysis of Plaintiff's remaining challenge to the ALJ's decision is unwarranted.

where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of § 405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings and by case law; and evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether her application for Supplemental Security Income should be granted.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability finding be vacated;

2. No finding be made as to whether Plaintiff Rose A. McGill was under a "disability" within the meaning of the Social Security Act;

3. This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. §405(g) for further consideration consistent with this Report; and

4. The case be terminated on the docket of this Court.

July 25, 2018                                        *s/Sharon L. Ovington*
                                                     Sharon L. Ovington
                                                     United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).